**IT IS ORDERED as set forth below:**



**Date: December 31, 2025**

*Susan D. Barrett*
_____

United States Bankruptcy Judge
Southern District of Georgia

---

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA

Augusta Division

| | | |
|---|---|---|
| IN RE: | ) | Involuntary Chapter 7 Case |
| | ) | Number 25-10257 |
| REMODELERS WAREHOUSE, | ) | |
| Alleged Debtor. | ) | |
| | ) | |
| | ) | |
| TINA CARTER and JAMES S. FALLER, II, | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REMODELERS WAREHOUSE, | ) | |
| Alleged Debtor. | ) | |
| | ) | |

## **OPINION AND ORDER**

Two petitioning creditors, Tina Carter ("Carter") and James S. Faller, II ("Faller") (collectively, Carter and Faller are "Petitioners"), filed a pro se involuntary chapter 7 bankruptcy petition against Remodelers Warehouse ("Remodelers" or "Alleged Debtor") pursuant to 11 U.S.C. §303 of the

1

Bankruptcy Code.[1]  Dckt. No. 1.  Remodelers filed a Motion to Dismiss which was converted to a Motion for Summary Judgment ("Motion for Summary Judgment") pursuant to Federal Rule of Civil Procedure 12(d),[2] and all parties were given a reasonable opportunity to present all material pertinent to the motion.  Fed. R. Civ. P. 12(d) ("If . . .  matters outside the pleadings are presented to . . . the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); Dckt. Nos. 9, 51.  Remodelers asserts it is entitled to summary judgment because Petitioners fail to satisfy the statutory dollar threshold requirements of §303 and the claims are subject to bona fide disputes as to liability and amount and are barred by res judicata.   This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (C), and (O).   For the following reasons, the Motion for Summary Judgment is GRANTED.

## **UNDISPUTED FACTS**

1.  Petitioners initiated this pro se involuntary bankruptcy case against Remodelers on April 24, 2025. Dckt. No. 1.

2.  On the petition they list their respective claims as follows:

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| Tina Carter | Damages/Judgment | $26,895.00 |
| James S. Faller, II | Debt due to damages | $6,250.00 |
| | Total of petitioners' claims | $33,145.00 |

Id.

---

[1]   Unless otherwise denoted, all statutory references are to Title 11 of the United States Code.

[2]   Made applicable by Bankruptcy Rule 7012.

3.  Remodelers' Corporate Ownership Statement provides:

> Remodelers Warehouse is a trade name of a dissolved limited liability company called CSD Investments, LLC.  The controlling member with over 95% ownership of CSD Investments, LLC is Corbin Dickson [("Dickson")].  The minority member is the spouse of Corbin Dickson.

Pet'rs' Hr'g Ex. F, Aug. 7, 2025; Dckt. No. 10.

4.  Dickson states he is the managing member of CSD Investments, LLC.  Dckt. No. 57 ¶ 2, at 4.

5.  In May 2023, CSD Investments, LLC filed a Certificate of Commencement of Winding Up with the Georgia Security of State's office.  See Dckt. No. 22, at 7; Dckt. No. 71, Dickson Dep. 42:13–43:24 (Pet'rs' Ex. 5), July 2, 2025.

6.  CSD Investments, LLC was administratively dissolved on September 8, 2023.  Dckt. No. 57 ¶¶ 4–6, at 4; id. at 6.

7.  Remodelers has fewer than twelve creditors.  Id. ¶ 10, at 5.

8.  Prior to the commencement of this involuntary proceeding, Carter filed a pro se action in the Magistrate Court of Columbia County, Georgia against Remodelers claiming Remodelers "failed to complete terms of contract, resulting in an incomplete/damaged kitchen."  Def.'s Hr'g Ex. B, Aug. 7, 2025.

9.  A copy of the contract has not been provided to the Court, but no party denies one exists.

10. Initially, Carter obtained a final order from the Magistrate Court in the amount of $11,000.00, plus court costs.  Def.'s Hr'g Ex. D, Aug. 7, 2025.

11. Remodelers appealed this Magistrate Court order to the Superior Court but failed to appear at the hearing.  Dckt. No. 9, at 5.

3

12. The Superior Court considered the appeal and awarded a final judgment in favor of Carter in the amount of $15,050.00 ("Judgment")[3] plus in April of 2023.  Def.'s Hr'g Ex. E, Aug. 7, 2025.

13. The Judgment is a final order, and a writ of Fieri Facias in the amount of $15,050.00 plus interest was entered in November of 2023.  Dckt. No. 9, at 21.

14. Carter testified[4] before she could collect the Judgment, Dickson began diverting Remodelers' assets to a new entity to avoid paying her.

15. Carter testified Petitioners filed this involuntary proceeding on April 24, 2025, in response to this alleged conduct.  See Dckt. No. 1.

16. Carter and Faller are each representing themselves independently, but from the Court's observation, it is clear that Faller has offered, and continues to offer, significant advice and leadership in the pursuit of this involuntary proceeding.

17. Faller states he is not a lawyer but has significant legal experience as well as expertise in construction matters.[5]

---

[3] For ease of reference, at times the Judgment is referred to as $15,000.00.  Nevertheless, the Court fully recognizes the Fieri Facias is in the amount of $15,050.00, plus interest.  Remodelers cites Roberts v. First Ga. Cmty. Bank, 335 Ga. App. 228 (2015), for the proposition that Carter is not entitled to interest on the Judgment.  Dckt. No. 9, at 4.  Whether or not interest accrues on the Judgment is immaterial to this Order's conclusions, because even with interest, the amount of the Judgment is still well below the threshold §303 sets forth for involuntary proceedings.  See generally O.C.G.A. §7-4-12(a) ("All judgments in this state shall bear annual interest upon the principal amount recovered at a rate equal to the prime rate as published by the Board of Governors of the Federal Reserve System, as published in statistical release H. 15 or any publication that may supersede it, on the day the judgment is entered plus 3 percent.").

[4] References to testimony throughout refer to the August 7, 2025 hearing unless otherwise noted.

[5] Faller states in pleadings he "has worked as an associate partner with United States Justice Richard Posner (7th Cir.) provided advice to a multitude of judges, justices and lawyers and has practiced in Courts around the world, including the United States Supreme Court."  Dckt. No. 27 at 1; see

4

18. Carter and Faller testified they are friends through church and that he agreed to help her in this process.  See Dckt. No. 62-1 ¶ 8, at 1.

19. Since entry of the Judgment, Carter and Faller assert additional claims and damages have arisen against Remodelers related to this kitchen remodel project, which Petitioners describe in various ways:

    a. "Damages/judgment" in the amount of $26,895.00 (of which $15,000.00 is the Judgment).  Dckt. No. 1 ¶ 13.

    b. "Additional fraud/unjust enrichment claims totaling $11,895."  Dckt. No. 23, at 1.

---

also Dckt. No. 62-1 ¶5 ("I have directly practiced at the United States Supreme Court, the Hague, multiple U.S. District, U.S. Courts of Appeals and various state Courts around the United States in the fight against corruption.").

When questioned by the Court at the May 24, 2025 hearing as to whether he was a licensed lawyer, Faller replied he is unlicensed but has been considered a lawyer even by the Supreme Court.  See also Dckt. No. 68, at 3 ("The United States Supreme Court recognized me as an autodidact 'Lawyer without a bar' when Justice Posner and I filed Amicus materials in a number of cases.  I only state this to enforce, I am not without knowledge or ability . . . ."); id., at 3 n.2 ("Although I am an autodidact lawyer, I worked with, under, and as a partner with multiple lawyers, judges and justices. I have practiced in cases around the world and am well versed in law and procedures."); id., at 1 ("[I am] a go to litigator for judges, lawyers, governments and victims of corruption.").  At the July 9, 2025 hearing, Faller testified he was a former partner of Justice Posner on the 7th Circuit.

At this same hearing, Faller also suggested he is familiar with the involuntary process and has previously been involved in such cases.  See also Dckt. No. 62-1 ¶¶ 43–44 ("I spoke with a sometimes partner of mine who does bankruptcy work.  He recommended that an involuntary Chapter 7 would help stop any further liquidation of the assets.").

Faller further testified he has been certified as an expert in construction matters, was a licensed engineer in five states, and has constructed $50 million in buildings.  See also Dckt. No. 62-1 ¶ 9 ("I was an expert witness in Construction cases in Ohio as a licensed engineer and contractor in (5) five jurisdictions and was required to meet the Daubert Standard in multiple cases I testified in.").

    c. "Additional claims based on newly discovered fraud, construction defects and defective appliances totaling more than $100,000." Dckt. No. 61, at 2.

    d. "[A]dditional claims for fraud, substandard workmanship, and replacement of defective appliances were not, and could not have been, adjudicated in the prior action. These arose only after the judgment." Id.

    e. Petitioners contend the damages in excess of the $15,050.00 Judgment relate to issues with the appliances and cabinets that arose after the initial suit, including, among other things, purported faulty workmanship, improper installation of appliances and cabinets, inadequate ventilation, required replacement of a tile backsplash, and failure to take the steps necessary to preserve Carter's warranties on the appliances. See id.

20. Carter testified her contract with Remodelers was the basis of her state court claim and Judgment. Carter also testified her additional claims in excess of the Judgment are from the same project with Remodelers but arose after the Judgment was entered.

21. Carter testified she intends to bring her evidence to the Court to prove the damages in excess of the Judgment.

22. Remodelers disputes any liability and amounts in excess of the Judgment and also maintains such excess claims are barred by res judicata. Dckt. No. 57 ¶ 7, at 4; see also Dckt. No. 9, at 4–5.

23. As for Faller's claim, the Petitioners describe it in their pleadings as follows:

    a. A "debt due to damages" in the amount of $6,250.00. Dckt. No. 1 ¶ 13.

    b. Faller is "a creditor of Remodelers Warehouse by virtue of having acquired claims exceeding $6,000.00 through service provision and other lawful transactions." Dckt. No. 2, at 2.

    c. "Faller's claims arise from personal services rendered and obligations directly owed by [Remodelers], not acquired claims" and "Faller holds valid service-based claims exceeding $6,250." Dckt. No. 23, at 1–2.

    d. "[Alleged Debtor] is in debt to the undersigned Petitioner [Faller] as a result of his negligence, causing the undersigned Petitioner [Faller] to engage in lawful efforts to resolve dangerous and unlawful situations caused by the named Respondent/Debtor." Dckt. No. 50-1 ¶ 6, at 2.

6

e.  Faller's claims "[a]re partially, but not totally Transferred Claims[.]  Faller's claims arise from personal services and contributions made directly to the Debtor's cause." Dckt. No. 61, at 3.

f.  "While $6,000 of a judgment held by co-petitioner Tina Carter was orally assigned to the undersigned [Faller] in consideration for extensive services performed well before the bankruptcy petition was contemplated, such assignment is not the basis for the undersigned's eligibility under 11 U.S.C. §303(b).  The undersigned holds independent claims arising directly from professional services rendered and damages personally incurred."  Dckt. No. 62 ¶ 3, at 1 (emphasis omitted); see also Dckt. No. 62-1 ¶¶ 25–27, at 3.

g.  Faller states Carter "agreed to transfer $6,000.00 of the [J]udgment to me to assist in completing the construction repairs and that I would need to help her collect it."  Dckt. No. 62 ¶ 25.

24. Faller and Carter testified Carter orally assigned a portion of her claim in the amount of $6,250.00 to him for his consulting work on this matter.

25. Faller testified he will get paid through Carter's collections from Remodelers.

26. Faller also testified his claim is on the "tail end" of Carter's claim.

27. Remodelers disputes Faller is a creditor of Remodelers and states it has never done business with Faller.  Dckt. No. 57 ¶ 9, at 5.

28. Faller acknowledged he has no direct contractual relationship with Remodelers.

29. Faller testified he intends to prove his additional damages in excess of the Judgment as part of this involuntary proceeding.

## **CONCLUSIONS OF LAW**

On a motion for summary judgment in an involuntary proceeding, the Court analyzes whether there is a genuine dispute of material fact that the involuntary petition meets the requirements of §303(b) which provides:

7

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

    (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $21,050 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

    (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $21,050 of such claims . . . .

§303(b)(1)–(2); <u>see also</u> Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law . . . .").[6]

"[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

    When the non-moving party has the burden of proof at trial [such as an involuntary bankruptcy proceeding], the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the non-moving party's claim or by pointing to specific portions of the record which demonstrate that the non-moving party cannot meet its burden of proof at trial.

<u>In re Haymond</u>, 633 B.R. 520, 535 (Bankr. S.D. Tex. 2021) (citing <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 606–08 (11th Cir. 1991)).

---

[6]    Made applicable by Bankruptcy Rules 1018 and 7056.

Once the moving party has properly supported its summary judgment motion with such evidence, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968)) (internal quotation marks omitted).  In determining whether summary judgment is appropriate, a court need only consider record materials that have been cited, although it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).  Also, "[i]n determining whether the movant has met its burden, the reviewing court must examine the evidence in a light most favorable to the opponent of the motion.  All reasonable doubts and inferences should be resolved in favor of the opponent." Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1502 (11th Cir. 1985) (citations omitted).

Also, it is well accepted that "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998).  However, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990).  This is especially true in an involuntary case where purported creditors are attempting to force an entity or person into bankruptcy, and, in this case, where Faller references extensive experience related to legal and construction matters.  Notwithstanding the foregoing, while the pleadings and testimony regarding the nature of Petitioners' claims has been confusing at times, all such matters have been liberally construed in favor of the Petitioners.

9

Applying these standards, the Court finds Remodelers has met its burden by establishing that Petitioners lack an essential element of their claim and cannot meet the threshold burdens of §303(b) and therefore summary judgment is appropriate.  See In re Haymond, 633 B.R. at 535 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("If . . . the record could not lead a rational trier of fact to find for the non-movant, summary judgment is appropriate.")).

**§303(b)(2) Threshold.**

In cases like this with fewer than 12 creditors, §303 establishes the following four-part test to commence an involuntary bankruptcy petition:

> (1) the petitioning claimholders' claims are not contingent as to liability, or subject to a bona fide dispute as to liability or amount;
> (2) the value of such claims total in the aggregate at least $21,050.00;[7]
> (3) there are fewer than twelve claimholders (exclusive of insiders, employees, transferees of voidable transfers, and holders of contingent or disputed claims); and
> (4) the alleged debtor is generally not paying its debts as they come due.

See In re Newbury Operating LLC, No. 20-12976, 2021 WL 1157977, at *4 (Bankr. S.D.N.Y. Mar. 25, 2021).  In this case, Remodelers argues Petitioners do not satisfy the first two elements—namely, their claims do not total in the aggregate at least $21,050.00, and the claims in excess of the Judgment are subject to a bona fide dispute as to liability and amount.

It is undisputed that Carter holds the Judgment; however, to satisfy the requirements to file an involuntary bankruptcy under §303(b)(2), aggregate claims not subject to a bona fide dispute as to liability or amount must equal or exceed $21,050.00.  §303(b)(2).  To reach this monetary threshold, both Faller and Carter testified they intend to use the adversarial involuntary process to show damages

---

[7]    Pursuant to §104, the dollar amount was adjusted to $21,050.00 as of April 1, 2025.  §104(a); Adjustment of Certain Dollar Amounts Applicable to Bankruptcy Cases, 90 Fed. Reg. 8941–8942 (Feb. 4, 2025).

10

in excess of the $15,050.00 Judgment.  Given the undisputed facts of this case, this acknowledgment, along with additional items discussed below, evidences the existence of a bona fide dispute as to the liability and amount of the claims in excess of the Judgment.

**Bona Fide Dispute.**

"The phrase 'bona fide dispute' is not defined in the Bankruptcy Code."  In re Int'l Oil Trading Co., LLC, 545 B.R. 336, 349 (Bankr. S.D. Fla. 2016).  "The legislative history makes it clear that Congress intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal.  Congress plainly did not intend to require a debtor to pay a legitimately disputed debt simply to avoid the stigma of bankruptcy."  Sipple v. Atwood (In re Atwood), 124 B.R. 402, 407 (Bankr. S.D. Ga. 1991).

> The primary purpose of disqualifying a creditor whose claim is subject to a bona fide dispute from filing an involuntary bankruptcy petition is to prevent such creditors from using involuntary petitions as a club to coerce the debtor to satisfy judgments when substantial questions may remain concerning the debtor's liability.

In re Rosenberg, 414 B.R. 826, 845–46 (Bankr. S.D. Fla. 2009) (citations omitted) (emphasis in original), aff'd, 472 F. App'x 890 (11th Cir. 2012); see also 2 Collier on Bankruptcy ¶ 303.11[1] (16th ed. 2025) ("Limiting qualifying claims to those not subject to bona fide dispute was an attempt [by Congress] to balance the interest of debtors and creditors in involuntary cases.  If creditors with clearly disputed claims could initiate an involuntary filing, they could improperly use the involuntary process (or threat of it) to extort either payment or at least a favorable resolution of a bona fide dispute from a debtor.  Moreover, as some courts have noted, Congress wanted creditors to settle disputed claims outside of bankruptcy, given the serious adverse impact of an involuntary petition on a debtor.").

11

Most courts, including those within the Eleventh Circuit, apply an objective standard to assess whether a bona fide dispute exists.  Farmers & Merchants State Bank v. Turner, 518 B.R. 642, 649 (N.D. Fla. 2014) (some citations omitted) (citing 2 Collier on Bankruptcy ¶ 303.11[1] (16th ed.) (noting the Second, Third, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits, as well as bankruptcy courts in the First and Eleventh Circuits, have adopted an objective standard)).  "This standard requires the court to determine whether there is an objective basis for either a factual or a legal dispute as to the validity of debt."  In re Int'l Oil Trading Co., LLC, 545 B.R. at 349 (citation and internal quotation marks omitted).

> Under this standard, a bona fide dispute exists and requires dismissal of the creditors' petition "if there is either a genuine issue of material fact that bears upon the debtor's liability [or amount], or a meritorious contention as to the application of law to undisputed facts."  In other words, "if there are substantial legal or factual questions raised by the debtor, the debtor can preclude the creditor from being an eligible petitioning creditor."  2 Collier on Bankruptcy ¶303.11[1].

Farmers & Merchants State Bank, 518 B.R. at 649 (alteration in original) (some internal citations omitted); Havens v. Leong (In re Leong P'ship), BAP Nos. NC-17-1015-STaB, NC-17-1034-STaB, 2018 WL 1463852, at *7 n.13 (B.A.P. 9th Cir. 2018) ("Applying the standard for summary judgment is somewhat confusing in [the involuntary context]:  [Alleged Debtor is] required to prove that there is no genuine dispute that [Petitioners'] claims [are] subject to a bona fide dispute, which require[s] evidence that there [is] a genuine issue of material fact as to the [Alleged Debtor's] liability or damages" in regards to Petitioners' claims.), aff'd, 788 F. App'x 539 (9th Cir. 2019).  "Because the standard is an objective one, an alleged debtor's subjective intent or belief is irrelevant, and the mere or conclusory denial of a claim's validity or amount is not sufficient to create a bona fide dispute."  In re Int'l Oil Trading Co., LLC, 545 B.R. at 349 (citation omitted).  However, "the statute does not

12

require the court to determine the outcome of any [bona fide] dispute, only its presence or absence. Only a limited analysis of the claims at issue is necessary." Id.; see In re HL Builders, LLC, No. 19-32825, 2020 WL 833287, at *11 (Bankr. S.D. Tex. Feb. 18, 2020).  "There are two components to this inquiry—liability and amount—and a petitioning creditor must satisfy both in order for a bankruptcy case to proceed." In re Taub, 438 B.R. 761, 771 (Bankr. E.D.N.Y. 2010).

**Claims in Excess of the Judgment.**

The petition lists Carter's claim at $26,895.00 and Faller's claim at $6,250.00.  Dckt. No. 1. However, the Judgment is in the amount of $15,050.00.  Def.'s Hr'g Ex. E.  At the hearing, Petitioners now estimate Carter's total claim is $100,000.00 to $110,000.00.[8]  Petitioners testify these additional damages have arisen since the entry of the Judgment, but they have not amended the involuntary petition.  Carter and Faller testified that these additional claims were discovered after an invasive removal of the cabinets and an extensive investigation, which uncovered inadequate hood fan capacity/ventilation, failing non-warrantied appliances, the need for repairs requiring the removal of a custom tile backsplash, defective cabinets and countertops, and other defective construction/installation performed by Remodelers, as well as fraud.  Dckt. No. 61, at 2.  Carter and Faller testify this work was within the scope of the contract and Remodelers failed to duly perform. Carter also testified Remodelers and Dixon failed to duly register the appliances as required to establish/preserve the warranties.  Faller testified he was hesitant to use the term "latent defect" to

---

[8]    Petitioners rely upon the affidavits of Tanya S. Smith and Katharine Lang Allen to establish additional damages.  See Dckt. No. 61, at 3.  They also rely upon a deposition of Dickson, a transcript of which they filed with the Court.  See Dckt. No. 71.  At this point the Court has not addressed any hearsay objections to the affidavits; however, the Court has viewed all reasonable doubts and inferences in a light most favorable to the Petitioners.

describe the damages in excess of the Judgment, but at times both he and Carter state these issues were not known prior to entry of the Judgment and could not have been adjudicated until after the Judgment was entered.   Petitioners also assert Remodelers' assets were improperly diverted to avoid the Judgment.

Remodelers denies it is liable for any claim or sum in excess of the Judgment.  Dckt. No. 57 ¶ 7, at 4.  Remodelers also contends these claims all should have been raised in the state court proceedings and are barred by res judicata.  Dickson further denies Remodelers was contractually responsible for the installation of the cabinets, countertops, range hood, or appliances.  Dickson testified Remodelers duly completed all work within the scope of the contract.  He denies the cabinets were incorrectly sized.  Rather, he contends Carter ordered a different appliance than originally planned, and the new appliance had different dimensions which resulted in sizing issues.  Carter acknowledges the refrigerator she initially selected was discontinued and she switched to a different model but still contends Remodelers' negligent work caused problems with her kitchen.  Finally, Remodelers denies any improper conduct regarding the Judgment.

After liberally considering the record in favor of the Petitioners, the Court finds bona fide disputes exist as to both liability and amount for any claim in excess of the Judgment.  First, the additional claims in excess of the Judgment have not been reduced to judgment and have not otherwise been established or fixed.

> It is important to emphasize here that the bankruptcy court's job under §303(b) is not to conduct a thorough trial and determine the proper legal result.  The bankruptcy court should only determine, objectively, whether there is a bona fide dispute.  After a three day trial, nearly every aspect of the Petitioning Creditors' claims has been vehemently contested and controverted through live witness testimony and documentary evidence.  This Court could not possibly determine whether Target Debtor is liable for the amounts claimed in the Amended Involuntary Petition by Petitioning Creditors or

whether the Investor Agreements were modified to eliminate Target Debtor's liability in making the payments under sections 6 and 8 to Petitioning Creditors without conducting a full trial on the merits. The Court's decision regarding the instant dispute certainly does not determine the actual liability of or amounts due by the parties, only that the claims are the subject of a bona fide dispute as to liability or amount. Accordingly, this Court finds that Petitioning Creditors lack standing to bring the Amended Involuntary Petition because their claims are the subject of a bona fide dispute as to liability and amount.

In re HL Builders, LLC, 2020 WL 833287, at *15.

It also is clear that bona fide disputes remain as to Remodelers' liability for any claim in excess of the Judgment. "A failure to demonstrate that no bona fide dispute exists as to liability is, standing alone, sufficient to disqualify a petitioning creditor and grounds to dismiss th[e] bankruptcy case." In re Taub, 438 B.R. at 773. Remodelers raises factual questions about: its liability for and the amount of any claim in excess of the Judgment; its responsibility for installation of appliances and the range hood; whether all the work under the contract was duly completed; its responsibility for improper cabinet sizes; whether the claims are subject to res judicata; whether these issues were patent defects discoverable at the time of the state court proceedings through the exercise of due diligence; and the existence of any pre- or post-judgment misconduct or fraud.

Undoubtedly, Carter contends serious damages remain regarding this project and Remodelers conduct, but the bona fide dispute and contingency provisions of §303 make it clear than an involuntary bankruptcy is not the proper vehicle to establish these claims or their amounts. See, e.g., Bankers Trust Co. BT Serv. Co. v. Nordbrock (In re Nordbrock), 772 F.2d 397, 399 (8th Cir. 1985) ("[E]fforts by a single creditor to use the Bankruptcy Court as a forum for the trial and collection of an isolated disputed claim [is] a practice condemned in prior decisions."); In re Tichy Elec. Co. Inc., 332 B.R. 364, 372 (Bankr. N.D. Iowa 2005) (citation omitted) ("It is also obvious that the use of the bankruptcy court as

a routine collection device would quickly paralyze this court."); <u>In re AXL Indus., Inc.</u>, 127 B.R. 482, 484 (S.D. Fla. 1991) ("[T]he bankruptcy court was not designed or intended to be the forum for trying isolated disputed claims . . . . Allowing creditors to use the bankruptcy court as a routine collection device would quickly paralyze the court."). The bona fide dispute and contingency provisions of §303 are threshold requirements to commence involuntary bankruptcies, and Petitioners have failed to meet this threshold. For these reasons, the Court finds the claims in excess of the Judgment are the subject of a bona fide dispute as to both liability and amount.

**Faller's Claim.**

The overall nature of Faller's claim is unclear from the testimony. At times he claims to be both a transferee of a portion of Carter's claim and a direct creditor of Remodelers. The involuntary petition filed by Petitioners lists Faller's claim as $6,250.00, and Petitioners initially claimed Faller held a claim as a transferee of a portion of Carter's claim. <u>See</u> Dckt. No. 1; Dckt. No. 50-1 ¶ 6; Dckt. No. 61, at 3; Dckt. No. 62-1 ¶¶ 25–27. Faller and Carter testified that Carter orally assigned[9] $6,250.00 of her claim to him for his consulting work.

At the hearing, Petitioners testified Faller's claim is based upon the time and expertise he has provided Carter in assessing the damage to her kitchen. He testified his claims are independent claims he holds against Remodelers, but he acknowledged he does not have, and has never had, any contractual relationship with Remodelers. <u>See</u> Dckt. No. 62 ¶ 3. He further testified his claim is on the "tail end" of Carter's, and he will be paid from the sums that Carter collects from Remodelers.

---

[9]   Alleged Debtor challenges this assignment under a statute of frauds theory. However, the Court need not reach that issue as recognition of the assignment does not impact the Court's conclusions in this Order.

16

Remodelers disputes Faller has any claim against it.  In support of the Motion for Summary Judgment, Remodelers filed the affidavit of Dickson in which Dickson states "[n]either Affiant [Corbin Dickson], Company [CSD Investments, LLC dba Remodelers], or any other entity that Affiant owns an interest in has done business with Petitioner James S. Faller, II.  Affiant disputes that James Faller, II, is a creditor of Company, Alleged Debtor, and Affiant personally."  Dckt. No. 57, at 5.

For the same reasons discussed above regarding Carter's claim, regardless of whether Faller's claim is part of the Judgment or truly an additional independent claim, it is subject to a bona fide dispute as to both liability and amount.  Remodelers also has raised additional factual questions about its liability for any independent claim asserted by Faller, including that it has never done business with Faller and has no contractual relationship with Faller.  Faller acknowledges Remodelers provided no services to him.  There is no evidence in the record documenting Faller's independent claim or showing Alleged Debtor's liability for any such claim.  Nor is there any evidence in the record establishing the amount of Faller's purported independent claim.  For these reasons, the Court finds there is no material question of fact that Faller's claim (to the extent not an assignment of a portion of the Judgment itself), is subject to a bona fide dispute as to both liability and amount.[10]

For these reasons, the Court finds granting the Motion for Summary Judgment is appropriate.

**Other Motions.**

In addition to the Motion for Summary Judgment, Petitioners and Remodelers filed numerous other motions, which are addressed below:

---

[10]  To the extent it is a portion of the Judgment, it reduces Carter's claim.  This calculation is not material to the analysis in this Order and is only discussed to denote the amounts cannot be counted twice.

17

**Petitioners' Motion to Strike.**

Petitioners seek to strike Alleged Debtor's Motion for Summary Judgment because they allege Dickson is not authorized to act on behalf of Remodelers. Dckt. No. 54, at 2, 3, 5, 7–8. They contend "[b]ecause a dissolved LLC continues to exist only to wind up, any litigation posture it takes must be in furtherance of winding up (e.g., collecting assets, defending claims, liquidating to pay creditors)" (emphasis omitted). Dckt. No. 54, at 7. Petitioners contend "winding up" does not encompass or include <u>defending</u> against an involuntary petition therefore, the Motion for Summary Judgment should be stricken. After consideration, the Court disagrees.

The Georgia[11] LLC statute does not define "winding up," but O.C.G.A. section 14-11-603(b)(3) provides "[w]inding up the business of a limited liability company administratively dissolved may include, <u>without limitation</u>, the limited liability company proceeding, at any time after the effective date of the administrative dissolution, in accordance with Code Sections 14-11-607 and 14-11-608 [providing procedures for disposing of known and unknown claims against LLC]." O.C.G.A §14-11-603(b)(3) (emphasis added). Also, O.C.G.A. §14-11-605 provides:

> (a) <u>In connection with its winding up</u>, a limited liability company shall (1) discharge, make provision to discharge, or dispose of pursuant to Code Sections 14-11-607 and 14-11-608 its liabilities, and (2) subject to any applicable provisions in the articles of organization or a written operating agreement, distribute its remaining assets to its members.

---

[11] <u>Cf.</u> <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); <u>In re A & B Assocs., L.P.</u>, 593 B.R. 27, 47 (Bankr. S.D. Ga. 2018) ("[T]he Court must turn to Georgia law to determine whether the Debtor is a valid limited partnership.").

O.C.G.A. 14-11-605(a) (emphasis added); see also Winding Up, Black's Law Dictionary (12th ed. 2024) (internal quotation marks and citation omitted) ("winding up or liquidation, as it is often known (the terms are commonly used interchangeably), is a process which involves a company's assets being collected and realized, with the resulting proceeds applied in discharging all debts and liabilities, and any balance which remains being distributed among the members according to their rights and interests, under the company's constitution, or otherwise dealt with as the constitution of the company directs. It is a process which prepares the company for its death, which is known as dissolution. Most often, winding up occurs where a company is not able to pay its debts.").

By its very nature, responding to an involuntary chapter 7 bankruptcy petition filed within two years of the administrative dissolution of an entity may be the ultimate "winding up" action in an LLC's life cycle. Defending against such an involuntary bankruptcy petition aimed at collecting disputed debts falls within the parameters of winding up; otherwise, such a dissolved entity would be subject to involuntary petitions that they could not defend against. See Republic-Franklin Ins. Co. v. Sec. Pros., Inc., No. CV407-060, 2007 WL 9706828, at *1 (S.D. Ga. Oct. 17, 2007) ("[P]laintiffs are seeking millions of dollars in damages from defendant, and it is difficult to perceive how defendant's efforts to avoid such liability, and thereby preserve its assets for other business purposes, is not part of winding up its affairs. To argue that a corporation in the process of dissolution is without authority to defend itself and its remaining assets against suit for money damages skirts close to the edge of frivolity . . . ."). For these reasons and the following reasons, the Court denies Petitioners' Motion to Strike.

Similarly, in this same motion, Petitioners assert Dickson has not shown he has authority to act upon Remodelers' behalf as required by O.C.G.A. §14-11-604. Dckt. No. 54, at 6–8. Georgia Code Section 14-11-604 provides:

19

(a) Except as otherwise provided in the articles of organization or a written operating agreement, <u>upon dissolution, the members or managers in whom management of the limited liability company was vested prior to dissolution may wind up a dissolved limited liability company's affairs</u>, or, if there are no such members or managers at the time of or at any time after such dissolution, such persons as may be designated by the persons then entitled to receive a majority of all subsequent distributions, if any, from the limited liability company may wind up the limited liability company's affairs . . . .

(b) <u>Except so far as may be appropriate to wind up the limited liability company's affairs</u> or to complete transactions begun but not then finished, dissolution terminates all authority of every person to act for the limited liability company . . . .

O.C.G.A. §14-11-604 (emphasis added).  After consideration, the Court disagrees with Petitioners, as the statute clearly authorizes managers of the LLC at the time of dissolution to wind up the affairs of the LLC.  Dickson is the managing member of CSD Investments, LLC, holding more than a 95% ownership interest in the LLC.  Dckt. No. 57 ¶ 2, at 4; Pet'rs Hr'g Ex. F; Dckt. No. 10.  For these reasons, the Court finds Dickson has the authority to act on behalf of the Remodelers in these proceedings.  For the foregoing reasons, the Court denies Petitioners' Motion to Strike.

**Remaining Motions.**

The other outstanding motions of the parties are mooted by the above rulings, including Petitioners' emergency motion to appoint an interim trustee and Alleged Debtor's motion to strike the affidavit of Faller.  Dckt. Nos. 2, 58.

**Conclusion.**[12]

For these reasons:

1. Alleged Debtor's Motion for Summary Judgment is ORDERED GRANTED.

2. Petitioners' Motion to Strike is ORDERED DENIED.

---

[12]  The cases cited by Petitioners were considered, but to the extent they are not discussed in this Order, the Court did not find them persuasive on the issues at hand.

20

3. The above-captioned case is hereby dismissed; provided, however, the Court reserves jurisdiction to consider any §303(i) matters, as expressly reserved by Remodelers.

**[END OF DOCUMENT]**